1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9

DEBRA ROSALYN KNOWLES,                    Case No.  1:14-cv-01657-SKO

10                                                          **ORDER ON PLAINTIFF'S COMPLAINT**

11                         Plaintiff,                       (Doc. No. 14)

12

13              v.

14    CAROLYN W. COLVIN,
      Acting Commissioner of Social Security,

15
                              Defendant.
16

17    _____

18
19
20

21                              **I.      INTRODUCTION**

22              Plaintiff, Debra Rosalyn Knowles ("Plaintiff"), seeks judicial review of a final decision of

23    the Commissioner of Social Security (the "Commissioner") denying her application for Disability

24    Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") benefits pursuant

25    to Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g); 1381-83.  The matter is

26    currently before the Court on the parties' briefs, which were submitted, without oral argument, to

27    the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

28    _____
      [1]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6; 8.)

## II.     FACTUAL BACKGROUND

Plaintiff was born on September 9, 1960, and alleges disability beginning on September 5, 2011.  (Administrative Record ("AR") 18; 34; 171; 193.)  Plaintiff claims she is disabled due to severe back, hip, leg, feet, arm, and hand pain, arthritis, anxiety, and depression.  (AR 66; 196; *see also* AR 69 (stating that while anxiety and depression were disabling problems in the past, Plaintiff "has not been prevented from working due to anxiety and depression for quite some time" and she has not sought treatment or medication for either "in a[ ]while").)

### A.     Relevant Medical Evidence

#### 1.     Dr. Bravo's Records

On April 8, 2008, Plaintiff was seen by Dr. Fernando Bravo, M.D., and complained of severe left side hip and leg pain and fatigue.  (AR 266.)  On examination, Plaintiff's left buttock was "very tender," she was able to walk on her heels and toes, and she was able to touch her toes with difficulty.  (AR 266.)  Dr. Bravo referred Plaintiff to a left-hip x-ray and recommended she see a neurosurgeon.  (AR 266.)  On April 15, 2008, Plaintiff complained of continuous left hip, leg, and foot pain, and reported that "Norco does not help" and that Vicodin does not "even touch the pain."  (AR 268.)  She reported being unable to sleep due to pain radiating from her low back down through her left foot.  (AR 268.)  On examination, she was unable to bend "at all" due to her pain, was able to talk on her toes but could not walk on her left heel, and displayed a positive straight leg test.  (AR 268.)

On April 29, 2008, Plaintiff complained of constant, severe, "excruciating" pain. (AR 265.)  On examination, Plaintiff was unable to walk on her left heel but could walk on her toes, and was able to bend down with pain.  (AR 265.)  Dr. Bravo continued her on Norco, referred her to a neurosurgeon, and excused Plaintiff from work for two weeks.  (AR 265.)  On May 13, 2008, Plaintiff reported "very little pain [ ] when she tries to bend or lift things" and had a normal gait and strength in her bilateral legs on examination.  (AR 269.)

On February 3, 2009, Plaintiff reported being under a great deal of stress, and Dr. Bravo noted symptoms of "palpitations," chest pain, insomnia, and irritability.  (AR 264.)  Dr. Bravo prescribed Lunesta, Celexa, and Effexor.  (AR 264.)  On March 3, 2009, Plaintiff reported

sleeping well with Celexa and no longer needing Lunesta. (AR 267.) On January 29, 2010, Plaintiff reported doing "okay" on Celexa and no problems sleeping. (AR 263.) On November 10, 2010, Plaintiff complained of fatigue and insomnia, and Dr. Bravo continued her on Celexa and Xanax to treat her degenerative disc disease of the lumbar spine, anxiety, and fatigue. (AR 262.)

**2.    National Health Services, Rosedale Community Health Center**

On May 23, 2011, Plaintiff was seen by Dr. Nagy Awadalla, M.D., and complained of back pain and joint pain, but did not present with neck pain, joint stiffness, muscle pain, or muscle weakness. (AR 282.) Plaintiff's paralumbar areas were tender bilaterally, however, and her lumbar spine range of motion was limited due to pain. (AR 282.) Dr. Awadalla ordered x-rays of Plaintiff's hip, lumbar spine, and shoulder. (AR 283.) Imaging revealed degenerative disc disease and narrowing at L5-S1, small spurs off the anterior endplates of L2 and L3, and minimal spondylosis, normal bilateral hips, and a normal left shoulder. (AR 304; 310.)

On June 1 and 15, and July 6, 2011, Plaintiff complained of left arm numbness and reported that "ever[y] joint in her body h[u]rts." (AR 272-73; 275-76; 277-78.) On examination, Plaintiff's paralumbar areas were tender bilaterally and her lumbar spine range of motion was limited in both flexion and extension due to pain. (AR 272; 275; 277.) Dr. Awadalla requested and Plaintiff was approved for four weeks of biweekly physical therapy for her lower back pain. (AR 305-06.) On May 24 and June 16, 2011, laboratory reports were negative for rheumatologic factor and antinuclear antibodies, suggesting Plaintiff does not have rheumatoid arthritis. (AR 274; 309; 373-74.) On July 6, 2011, Plaintiff was diagnosed with lumbago, pain in the joint involving the "pelvic region and thigh," and pain in the joint involving the "shoulder region." (AR 272.)

**3.    Clinica Sierra Vista**

On July 26, 2011, Plaintiff was seen by Dr. Geetanjali Sharma, M.D., and complained of continual, diffuse full-body pain and stiffness and increased pain in her bilateral hips and shoulder. (AR 315.) On August 17, 2011, Dr. Sharma requested lumbar and cervical spine MRIs and a rheumatology consultation through Kern Medical Center Health Plan to investigate possible

1  diagnoses of arthritis and fibromyalgia to explain Plaintiff's history of body stiffness and aching
2  joints.  (AR 291-92; 294; *see also* AR 293 (second referral request on September 8, 2011); 300-01
3  (referral for rheumatology denied on September 20, 2011, because clinic "not set up" for
4  rheumatology); 302 (third referral request on October 6, 2011).)

5      Radiological imaging of Plaintiff's cervical spine on August 11, 2011, revealed mild
6  degenerative changes at the C5-6 and C6-7 levels.  (AR 311-13.)  On August 17, 2011, Plaintiff
7  complained of pain and told Dr. Sharma "she can't walk at all."  (AR 314.)  Dr. Sharma advised
8  Plaintiff to go the emergency room in the future if she is in "so much pain."  (AR 314.)

9      On September 23, 2011, Dr. Sharma ordered a lumbar spine MRI without contrast for a
10 diagnosis of lumbar spine cord compression and a cervical spine MRI without contrast to evaluate
11 mild degenerative changes at C5-6 and C6-7.  (AR 295-96.)  On October 6 and November 3, 2011,
12 Dr. Sharma's referrals for a rheumatology and "neuro" consult were again denied by Kern
13 Medical Center Health Plan.  (AR 316; 414.)

14     A cervical spine MRI on October 26, 2011, revealed straightening of the normal cervical
15 lordosis with superimposed ventral and right-sided disc protrusion and osteophyte at C5-6
16 resulting in mild canal stenosis with no cord compression, moderate-to-severe right- and mild-to-
17 moderate left-sided foraminal stenosis; a ventral and left-sided disc protrusion and osteophyte at
18 C4-5 resulting in mild canal stenosis with no cord compression, moderate left- and mild right-
19 sided foraminal stenosis; and mild canal stenosis with no cord compression and mild-to-moderate
20 bilateral foraminal stenosis at C3-4 and C6-7.  (AR 318-19; 415-16.)  A lumbar spine MRI
21 revealed no significant changes from the April 2008 study.  (AR 320; 418.)  Mild-to-moderate
22 canal and moderate bilateral foraminal stenosis at L5-S1 and L4-5 secondary to bulging discs and
23 facet hypertrophy; mild canal and moderate bilateral foraminal stenosis at L3-4; mild canal and
24 mild-to-moderate bilateral foraminal stenosis at L2-3; and mild canal and bilateral foraminal
25 stenosis at T11-12 were observed.  (AR 320-21; 417-18.)

26     On November 17, 2011, Plaintiff complained of severe pain and stiffness and reported
27 poor sleep due to her pain, but reported her pain was addressed by Vicodin and she was able to
28 sleep with Ambien.  (AR 410.)  On December 1, 2011, Plaintiff reported that Cymbalta had helped

her symptoms "a lot." (AR 407.)  On January 25, 2012, however, Plaintiff discontinued Cymbalta because she thought it made her "do more/[increase her] activity, thus causing pain on the left leg and more stiffness." (AR 406.)  Plaintiff asked Dr. Sharma to fill out paperwork so she could go on disability.  (AR 406.)  Plaintiff had seen a pain management specialist and been offered injections, but expressed hesitation to allow a pain management physician to do the injections.  (AR 406.)  Plaintiff was counseled that the benefits of pain management outweighed the risks.  (AR 406.)  When she was told that she would not be put on disability, Plaintiff became upset and asked Dr. Sharma how she would pay for her bills.  (AR 406.)

On June 29, 2012, Plaintiff told Dr. Sharma that Cymbalta "altered her personality" and complained of pain, leg weakness, and hand and finger numbness.  (AR 404.)  Plaintiff expressed frustration that no diagnosis had been made, and declined a psych-consultation and refused anti-depressants.  (AR 404.)  On examination, Plaintiff complained of pain on spinal palpation but appeared to exaggerate the limitations of her biceps and knees range of motion, as her range was normal on repeat examination.  (AR 404.)

On August 15, 2012, Plaintiff was upset, "crying" and "demanding to be told what's wrong with her." (AR 393.)  On August 28, 2012, Dr. Sharma told Plaintiff that she is not a specialist, and advised Plaintiff that she needed to consult with a rheumatology specialist.  (AR 392.)  Plaintiff declined a private referral and elected to wait on approval for her rheumatology referral.  (AR 392.)  Dr. Sharma assessed Plaintiff as having chronic pain and foraminal stenosis with sural neuropathy, and referred her to a neurosurgical consult.  (AR 392.)  On September 24, 2012, Plaintiff was seen for headache and ongoing pain in her eyes lasting two weeks, and reported a history of herpes simplex in her bilateral eyes and migraines.  (AR 391.)  On February 9, 2013, Plaintiff told Dr. Sharma she had been offered a diagnosis of fibromyalgia but denied it, asserting instead that "something is wrong [with] her back." (AR 389.)  Plaintiff declined fibromyalgia medication and physical therapy and declined a referral to pain management.  (AR 389.)

**4.    Case Analyses by Non-Examining State Agency Physicians**

On November 25, 2011, based on Plaintiff's statement to the claims examiner regarding the impact of Plaintiff's history of depression and anxiety on her ability to work, Dr. Heather

1  Barrons, Psy.D., opined that her affective disorders were non-severe impairments.  (AR 71.)  Dr.

2  Barrons also completed a Psychiatric Review Technique Form, noting that Plaintiff did not meet

3  the A, B, or C criteria of the Listings for a severe mental impairment.  (AR 72.)  On

4  reconsideration, Plaintiff did not provide any additional complaints or records, and Dr. J.

5  Levinson, Ph.D., affirmed Dr. Barron's assessment of Plaintiff's mental impairments as non-

6  severe.  (AR 94-95.)

7        Dr. C. De la Rosa, M.D., noted on January 3, 2012, that Plaintiff's medical record reflected

8  degenerative disc disease and narrowing at L5-S1, mild degenerative changes at C5-6 and C6-7,

9  minimal objective findings on examination including reduced range of movement accompanied by

10 tenderness at her lumbar and sacral levels, and the consultative examination revealed no evidence

11 of radiculopathy, motor weakness, atrophy, or significant loss of range of movement.  (AR 71.)

12 Dr. De la Rosa assessed Plaintiff as partially credible, as her symptoms "appear[ed] greater" than

13 the objective findings on examination would support.  (AR 73.)  He opined Plaintiff could lift

14 and/or carry 50 pounds occasionally and 25 pounds frequently, stand, walk, or sit about 6 hours

15 out of an 8-hour workday, and had no postural, manipulative, or non-exertional limitations.

16 (AR 74.)  Dr. De la Rosa assessed Plaintiff as retaining a medium residual functional capacity,

17 considering her pain symptoms and evidence of degenerative disc disease (AR 71), and concluded

18 Plaintiff could perform her past relevant work as actually performed (AR 75).

19        On reconsideration, Plaintiff reported undergoing additional treatment for her symptoms,

20 but did not provide any treating records, and provided copies of imaging of her cervical and

21 lumbar spine that reflected only mild to moderate degenerative changes.  (AR 94.)  Dr. Keith M.

22 Quint, M.D., F.A.C.P., affirmed Dr. De la Rosa's assessment of a medium RFC.  (AR 94; 96-97.)

23        **5.     Internal Medicine Evaluation**

24        On December 14, 2011, Dr. Fariba Vesali, M.D., performed a comprehensive internal

25 medicine evaluation at the request of the agency.  (AR 323-27.)  Plaintiff complained of "constant,

26 sharp, dull, and burning" neck and upper back pain radiating to the upper arms, numbness of the

27 arms, and lower back pain exacerbated by sitting and standing.  (AR 324.)  Vicodin relieved the

28 pain, and she had not received physical therapy for her neck or low back pain.  (AR 324.)  Plaintiff

1  reported she lives by herself, rarely drives, does her own grocery shopping, cooks, does the dishes,

2  sweeps, and mops.  (AR 324.)

3      On examination, Plaintiff was alert and did not appear to be in acute distress.  (AR 325.)

4  She did not have any difficulties in taking off her shoes or putting them back on, getting on and

5  off the examination table, or picking up a paper clip from Dr. Vesali's hand.  (AR 325.)  Plaintiff

6  walked with a normal gait and did not use an assistive device for ambulation.  (AR 325.)  Plaintiff

7  complained of pain on range of motion in her cervical and lumbar spine, had a positive axial

8  compression test in rotation of the trunk and complained of an exacerbation of low back pain and

9  tenderness in her left buttock, but no tenderness on her cervical, thoracic, or lumbosacral spine.

10  (AR 325-26.)  Plaintiff had normal muscle bulk and tone and motor strength of 5/5 in her bilateral

11  upper and lower extremities.  (AR 326.)  Dr. Vesali diagnosed Plaintiff with chronic neck pain due

12  to degenerative disc disease of the cervical spine and chronic low back pain due to degenerative

13  disc disease of the lumbar spine.  (AR 326-27.)

14      Dr. Vesali opined Plaintiff can walk, stand, and sit for six hours in an eight-hour day with

15  normal breaks, ambulate without an assistive device, lift and carry 50 pounds occasionally and 25

16  pounds frequently, do frequent postural activities, and has no manipulative or workplace

17  environment limitations.  (AR 327.)

18      **6.    Kern Medical Center**

19      On February 8, 9, and 14, 2012, Plaintiff did not attend her physical therapy appointments.

20  (AR 355-56.)  On February 16, 2012, Plaintiff was seen for her first physical therapy appointment,

21  and complained of chronic back pain.  (AR 352.)  Plaintiff reported she received a steroid injection

22  two weeks prior and experienced "dramatic improvement" in her symptoms, reporting "very

23  minimal discomfort now after the shot at 3/10 pain."  (AR 352; 353.)  Plaintiff also reported

24  occasional sharp pain in her low back from squatting, bending over, getting up and down from a

25  chair or the supine position, and an increase in spasm and ache after sitting for more than thirty

26  minutes.  (AR 352.)  On February 22, 2012, Plaintiff cancelled and rescheduled her physical

27  therapy appointment (AR 351), and on February 24, 2012, Plaintiff's activity was limited due to

28  severe weakness and poor muscle endurance, and she complained of bilateral heel pain (AR 350).

On March 2, 2012, Plaintiff complained of mid-thoracic pain that started the previous weekend when "she walked a few blocks and was on her feet all afternoon." (AR 349.)  She described a "pins and needle sensation on her mid[-]thoracic and back area" and a "deep ache at 8/10." (AR 349.)  On March 6 and 13, 2012, Plaintiff reported feeling "better" and being able to "walk and move without so much pain." (AR 346-48.)  On March 20, 2012, Plaintiff cancelled and rescheduled her physical therapy appointment due to lacking gas money. (AR 345.)  On March 27, 2012, Plaintiff reported feeling sore in her neck and back, and complained that she had walked a block from her home the day before and "felt like her legs are real heavy." (AR 344.)

On April 3, 2012, Plaintiff reported she volunteered to clean a park and swept for forty-five minutes, at which point her back "started bothering her more." (AR 342-43.)  She also admitted she "did not do much home exercises[,] as she ha[s] [ ] very limited space at home." (AR 343.)  On April 12, 2012, Plaintiff reported her soreness had worsened and described feeling soreness in her bilateral shoulders, elbows, wrists, back, hips, knees, and ankles.  (AR 341.)  Plaintiff expressed concern that she was regressing in her improvement, and tolerated her physical therapy exercises with difficulty. (AR 341.)  On April 10, 17, 19 and 24, and May 1 and 8, 2012, Plaintiff cancelled or did not attend her physical therapy appointments. (AR 338-40.) On June 5, 2012, Plaintiff was discharged from physical therapy after she stopped attending "due to coverage issues." (AR 338.)

On August 1, 2012, Dr. Sharma referred Plaintiff for a nerve conduction study. (AR 332-34.)  The nerve conduction study revealed mild to moderate right sural sensory neuropathy, but indicated otherwise normal bilateral median and ulnar motor and sensory, radial sensory, peroneal and post ribial motor and left sural sensory potentials. (AR 334.)  Electromyography of Plaintiff's bilateral upper and lower limbs was normal without denervation or myopathy in muscles tested; however, Plaintiff was unable to tolerate further electromyography of her lumbosacral paraspinal area, so no results were obtained for Plaintiff's lower back and buttocks. (AR 334.)

On October 31, 2012, Plaintiff was seen for a neurosurgical consultation with Dr. William J. Meyer, M.D., who noted Plaintiff complained of longstanding neck, shoulder, and arm pain with numbness in her hands. (AR 329.)  Plaintiff reported being unable to stand very long and feeling

1   that her legs are "heavy."  (AR 329.)  She finds it difficult to move, and described the pain as

2   being like "having a baby."  (AR 329.)  Plaintiff reported having a facet injection and experiencing

3   improvement in her shoulders and deltoid area, but also reported side-effects of vomiting and

4   headache after the injection.  (AR 329.)

5        On examination, Plaintiff presented with a flat affect but "absolutely denie[d] being

6   depressed."  (AR 330.)  She had good range of motion in her head, neck, and limbs, normal

7   muscle tone, somewhat wide based and slow gait, and decreased sensation in the lateral aspect of

8   her right leg.  (AR 330.)  Dr. Meyer diagnosed Plaintiff with chronic intractable pain, probable

9   fibromyalgia, and claustrophobia.  (AR 330.)  Dr. Meyer informed Plaintiff he could not offer any

10  neurosurgical intervention for her cervical or lumbar pain, and reviewed the results of her nerve

11  conduction study.  (AR 337.)  He advised Plaintiff of her possible diagnosis of fibromyalgia and

12  recommended she follow-up with her primary care physician, and she responded that her primary

13  care physician "does not think fibromyalgia is a legitimate diagnosis."  (AR 337.)

14  **B.**       **Testimony**

15           **1.**       **Plaintiff's Written Reports and Self-Assessment**

16       Plaintiff earned a GED from Bakersfield Adult School in 1995 and studied business

17  administration for a year at Santa Barbara Business College from 1995-1996.  (AR 197.)  Plaintiff

18  reported that she has been diagnosed and treated for four herniated discs in her lower back.

19  (AR 203.)  When Plaintiff lost her job in 2008, she also lost her health insurance and has been

20  forced to pay for appointments in cash and go on the "MIA Program" through Kern County

21  Medical Center.  (AR 203.)  Plaintiff has found two "small jobs" that she liked "very much," but

22  she has been unable to keep them because she "just can no longer stand the pain."  (AR 203.)  She

23  cannot be on her feet for more than an hour "without pain so bad [she] fear[s] [she] will pass out"

24  and even sitting "for very long is agony."  (AR 203; *see also* AR 232.)  Plaintiff described putting

25  on shoes and socks as "unbearable" and complained that she "cannot hardly do anything

26  anymore."  (AR 224.)  "The only way [she] can get anything done is by taking Vicodin first" and

27  she can "barely walk after merely 3 h[ou]rs of light work."  (AR 224.)

28  //

On October 4, 2011, Plaintiff completed an adult function report.  (AR 225-32.)  Plaintiff stated that she worked three hours on Mondays, Wednesdays, and Fridays, and then spent the rest of her week "off [her] feet" because she "cannot do much anymore."  (AR 225.)  On Tuesdays and Thursdays, every other week, she also worked for A-1 Card Service.  (AR 225.)  On Thursday evenings, she would go to church, and "go out in the ministry once or twice a week on [her] days off for an hour if [she] think[s] [she] can endure being on [her] feet for an hour."  (AR 225.) Plaintiff takes a sleeping pill at night "or the pain will keep [her] awake all night."  (AR 225.)  In order to "be on [her] feet" she must take a Vicodin for pain, "otherwise forget it."  (AR 225.)

Plaintiff sweeps, wipes counters and mirrors, does her own laundry, and is able to clean her toilet and bathtub, though it is "very hard."  (AR 227.)  She does not do any yardwork or ironing.  (AR 227.)  Plaintiff cares for her pet Chihuahua.  (AR 225-26.)  It is "very hard" for Plaintiff to put on shoes, socks, and pants and it is "difficult" for Plaintiff to shave her legs, as she cannot bend over or lift her legs.  (AR 226; *see also* AR 252 (Plaintiff "struggle[s] with personal care" and has difficulty bending over, getting dressed, and painting her toes).)  She purchased a "long handle scrubber" to wash her feet.  (AR 226.)  She prepares "easy dinners" on her stove and sandwiches, taking fifteen minutes to a half-hour, because she can no longer cook meals requiring her to stand at the stove.  (AR 227.)  Plaintiff is able to drive, but notes that it is becoming progressively more difficult for her to get in and out of her truck.  (AR 228.)  Plaintiff goes shopping twice a month for approximately one hour.  (AR 228.)  Most evenings she reads and studies her religious materials, but reports difficulty concentrating due to her pain and discomfort and complains that her fingers are getting stiffer.  (AR 229.)

Plaintiff can walk a half a block before needing to rest for twenty minutes, and is able to pay attention "until the Vicodin wears off."  (AR 230.)  She does not handle stress well, and becomes "confused and lost" due to changes in routine.  (AR 231.)  She uses a cane when walking, but does not have a prescription.  (AR 231.)

### 2. Plaintiff's Mother's Third Party Assessment

Plaintiff's mother Naomi Lopez completed a third party adult function report on October 6, 2011.  (AR 233-40.)  Ms. Lopez's assessment is substantially similar to Plaintiff's self-assessment.

(*Compare* AR 225-32 *with* 233-40.)  Ms. Lopez described her daughter's activities each day: getting up, taking a shower, getting dressed, drinking her coffee, going to work, going home, and then going to bed.  (AR 233.)  She has difficulty sleeping due to her body pain, and has difficulty putting on her shoes.  (AR 234.)  Plaintiff makes simple meals like sandwiches, pasta, canned vegetables, and "hamburger meals."  (AR 235.)  Plaintiff cleans her small trailer, does her laundry, and cares for her pet on her own.  (AR 234-35.)  Plaintiff goes shopping once or twice a month, and each week she goes to church, visits with her family or speaks with them on the phone.  (AR 236-37.)  Ms. Lopez reported Plaintiff has a "hard time" lifting, squatting, bending, standing, reaching, walking, kneeling, and climbing stairs "because of the pain in her back, feet, shoulders, [and] neck."  (AR 238.)  Plaintiff cannot walk "very far" before having to rest fifteen to twenty minutes, and uses a cane to walk.  (AR 238-39.)

### 3.    Plaintiff's Testimony at Hearing

Plaintiff testified at a hearing before an ALJ on March 26, 2013.  (AR 33-65.)  Plaintiff testified that when she first began having pain, she went to her primary physician Dr. Bravo.  (AR 37.)  Dr. Bravo prescribed her strong pain medication and ordered an MRI.  (AR 37.)  While waiting for the results, Plaintiff continued working as an assistant manager at Washington Mutual Bank while taking the strong pain medication.  (AR 37.)  At some point, Plaintiff and two of her subordinates were terminated because $500 went missing.  (AR 38.)  Plaintiff looked for work, but stopped after her last part-time job with a greeting card services company.  (AR 38.)  Plaintiff testified that she truly enjoyed the greeting card job and another job as a home care helper through the county, but could not maintain part-time work because she "couldn't stand up anymore."  (AR 35-36; *see also* 38-39 (testifying that she "just couldn't physically do them anymore").)  Plaintiff testified that

> . . . I wanted to keep trying [to work] even though my body was telling me I couldn't do it.  I wanted to try, to see what I could accomplish.  And I just couldn't do it.  No matter what I tried to do, I couldn't do it.

(AR 39.)

Plaintiff testified that she can lift 20 pounds.  (AR 39.)  She can tolerably stand for up to five minutes, but her pain increases to agony if she stands longer and she cannot stand long

1  without assistance.  (AR 39-40.)  She can walk at a slow pace for fifteen to 20 minutes, and finds

2  walking slowly more tolerable than standing still.  (AR 40.)  Sitting relieves her legs but "seems to

3  put pressure on her neck and arms."  (AR 40.)  She can sit for an hour at a time, and if her chair is

4  very soft, her pain is reduced.  (AR 40.)  In order to be functional for an hour and a half to two

5  hours, Plaintiff has to rest five or six hours.  (AR 55.)

6      While she worked part-time for the greeting cards company, she could not stand and make

7  the arm movements required to complete her shifts.  (AR 53-54 ("I would walk out of there . . . .

8  [j]ust doing the shuffle.  My feet.  I could not move. . . . I cannot express to you the pain that's

9  involved in standing and moving.  It was terrible.").)  Plaintiff said that a "set shot" in her back in

10  October of 2011 helped ease her back pain somewhat, but "didn't make [her] feet functional or

11  [her] arms functional."  (AR 54.)

12      On a typical day, Plaintiff wakes up and "struggle[s]" to walk.  (AR 41 ("I can barely

13  move to walk").)  She noted that the back of her heels "won't flex" and "won't move right."

14  (AR 41.)  She walks about one hundred feet to unlock the gate at her residence.  (AR 41.)  She

15  makes her bed, does laundry, and sweeps, but cannot do anything requiring her to bend at the

16  waist and has difficulty grocery shopping.  (AR 41-43.)  She cannot bend to "do [her] toes" and

17  cannot dance.  (AR 43.)  She studies and reads for most of her day, and a few days a week goes

18  out for "service" as a Jehovah's Witness for an hour at a time.  (AR 41-42; 56.)  She does not

19  serve the hour straight through, however, and has to stop and rest every fifteen minutes or so.

20  (AR 42.)  Occasionally, she will play a computer game for about a half an hour at a time.  (AR 42-

21  43.)  Plaintiff has tried exercising, but "[t]here is no exercise [she] can do that will not worsen

22  [her] condition."  (AR 45.)  Plaintiff is able to drive short distances a couple of times a week, but

23  cannot remain in a car for two hours to visit her children.  (AR 34; 56-57.)

24      Plaintiff takes Vicodin sometimes when her pain is severe, but fears becoming addicted so

25  she tries to rest instead.  (AR 45-46.)  Vicodin makes her sleepy and makes her heart "palpitate for

26  some reason."  (AR 47.)  She takes Ambien to sleep at night.  (AR 45.)  Plaintiff was on anti-

27  depressants for over a decade, but quit using them because she suspected they might be causing

28  her pain symptoms.  (AR 48-49.)  When she stopped using anti-depressants, however, her

symptoms did not improve.  (AR 49.)  The ALJ asked her what her physicians have advised for the limitations imposed by her impairments, and Plaintiff responded that:

> . . . we haven't discussed that.  I mean, every time that I've gone in there I've told them I can't move, I can't walk, I can't move, I can't walk.  And how much pain that I'm in.  But they just don't seem to be able to do anything about it.  They don't know what to do about it.

(AR 48.)  Plaintiff "was always crying" and "always in pain," so Dr. Bravo referred her to a neurosurgical consultation where she was offered and rejected a diagnosis of fibromyalgia.  (AR 51.)  Plaintiff testified that she disbelieved Dr. Meyers' fibromyalgia diagnosis because she had been told by a nurse's aide that fibromyalgia is a "trashcan diagnosis for when they can't find what's wrong with you."  (AR 51-52.)  Dr. Meyers corrected her, however, and explained to her that fibromyalgia is a "nerve problem."  (AR 52.)

The ALJ asked Plaintiff about a physician's note from January 25, 2012, reflecting that she requested to be put on state disability and was upset when the doctor would not put her on state disability.  (AR 49.)  Plaintiff testified that Dr. Bravo would not put her on disability because "[s]he said she wasn't going to lose her license."  (AR 49.)  Plaintiff clarified, however, that it was not because her physician thought she was not disabled or in disabling pain that she was not put on disability; by the time she saw Dr. Bravo, too long a period of time had elapsed since her last day of work for her to qualify for state disability benefits.  (AR 50; 57-58.)

### 4.   VE Testimony

The vocational expert ("VE") testified at the hearing that Plaintiff had prior relevant work experience as an in-home support service worker, Dictionary of Occupational Titles ("DOT") 354.377-014, medium work with an SVP[2] level of 3 performed as light work, as a bank manager assistant, DOT 211.362-018, light work with an SVP level of 5 performed as medium, as a file clerk, DOT 206.367-014, light work with an SVP level of 3 performed as sedentary, and as a billing clerk, DOT 214.382-014, sedentary work with an SVP of 4.  (AR 61.)

---

[2]   Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

1  The ALJ asked the VE whether "an individual that can lift 20 pounds . . . [and] can sit,

2  stand, and walk for six hours each out of an eight-hour day" could perform Plaintiff's past relevant

3  work.  (AR 62.)  The VE testified such an individual could perform all of Plaintiff's past work "as

4  it was either described or as performed."  (AR 62.)

5  Plaintiff's attorney posed a hypothetical to the VE, adding to the ALJ's hypothetical the

6  additional restriction that the individual would need to "lie down for at least an hour above and

7  beyond" normal rest breaks.  (AR 62.)  The VE testified such a person could not work on a full-

8  time basis.  (AR 62.)  Plaintiff's attorney posed a second hypothetical to the VE, asking whether

9  an individual that "can stand less than an hour, walk for less than an hour, and sit for about an

10  hour" would be employable.  (AR 62-63.)  The VE testified that there would be no work available

11  for such an individual.  (AR 63.)

12  **C.**     **Administrative Proceedings**

13  On April 15, 2013, the ALJ issued a decision and determined Plaintiff was not disabled.

14  (AR 18-26.)   The ALJ found Plaintiff had severe impairments including fibromyalgia and

15  degenerative disc disease of the cervical and lumbar spine.  (AR 20.)  The ALJ determined these

16  impairments did not meet or equal a listed impairment.   (AR 20.)   The ALJ found Plaintiff

17  retained the residual functional capacity ("RFC")[3] "to perform the full range of light work as

18  defined in 20 CFR §§ 404.1567(b) and 416.967(b)."  (AR 21.)  Given this RFC, the ALJ found

19  Plaintiff was able to perform the requirements of her past relevant work as an assistant bank

20  manager and file clerk.  (AR 25.)  The ALJ concluded Plaintiff was not disabled, as defined in the

21  Social Security Act, from September 5, 2011, the alleged onset date, to the date of the decision.

22  (AR 25.)

23  //

24

---

25  [3]     Residual functional capacity ("RFC") is an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week,

26  or an equivalent work schedule.   Social Security Ruling ("SSR") 96-8p.   The RFC assessment considers only
functional limitations and restrictions that result from an individual's medically determinable impairment or

27  combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in
the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are
reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th

28  Cir. 2006).

1    Plaintiff appealed the ALJ's decision to the Appeals Board on April 30, 2013 (AR 14), and

2    the appeal was denied on August 19, 2014, making the ALJ's decision final (AR 1-6).

3    **D.    Plaintiff's Complaint**

4    On October 22, 2014, Plaintiff filed a complaint before this Court seeking review of the

5    ALJ's decision.  (Doc. 1.)  Plaintiff asserts the ALJ failed to articulate clear and convincing

6    reasons for finding Plaintiff's and her mother Naomi Lopez's statements less than fully credible.

7    (Docs. 11; 13.)

8    **III.    SCOPE OF REVIEW**

9    The ALJ's decision denying benefits "will be disturbed only if that decision is not

10   supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

11   601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

12   judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

13   Instead, the Court must determine whether the Commissioner applied the proper legal standards

14   and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

15   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

16   "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

17   *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

18   relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

19   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

20   305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

21   the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

22   may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

23   *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

24   **IV.    APPLICABLE LAW**

25   An individual is considered disabled for purposes of disability benefits if he is unable to

26   engage in any substantial, gainful activity by reason of any medically determinable physical or

27   mental impairment that can be expected to result in death or that has lasted, or can be expected to

28   last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.   *Id.* §§ 404.1520(c), 416.920(c).   If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled.   *Id.* §§ 404.1520(d), 416.920(d).   If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.   *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

Plaintiff contends the ALJ erred by finding Plaintiff's testimony less than fully credible and by failing to make any explicit credibility finding on her mother Naomi Lopez's testimony.

**A.     The ALJ Erred in Assessing Plaintiff's Credibility**

Plaintiff contends the ALJ failed to articulate clear and convincing reasons for discounting her statements regarding the severity and extent of her ongoing symptoms.   (Docs. 11, 13.) Plaintiff asserts the ALJ erroneously rejected her testimony based on a belief that it lacks support

in the objective medical evidence, alleged "exaggerations" and refusal of medications and treatment, and a perceived inconsistency between her activities of daily living and her claim of disability. (Doc 11, pp. 11-17.) The Commissioner contends the ALJ properly relied on evidence in the record that undermined the credibility of Plaintiff's subjective complaints. (Doc. 12, p. 7.)

### 1.    Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). The ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Vasquez*, 572 F.3d at 591. The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection. *Id.*

The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); 20 C.F.R. §§ 404.1529, 416.929. "If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing." *Tommasetti*, 533 F.3d at 1039.

### 2.    The ALJ Erred in Discounting Plaintiff's Credibility

The ALJ reviewed the medical record and Plaintiff's allegations that she is unable to perform all work due to her alleged impairment and other symptoms. (AR 21-23.) He also reviewed the diagnostic studies and surgical consultation Plaintiff underwent to evaluate her chronic neck and back pain. (AR 22-23.) The ALJ partially credited Plaintiff's complaints of

lower back and neck pain and incorporated the "limitations caused by [her] musculoskeletal impairments" in his RFC assessment.  (AR 24.)   However, when considered in light of the minimal objective medical findings in the record, Plaintiff's inconsistent complaints of pain, history of conservative and declined treatment, indications of exaggerations and refusal of medications and treatment, the ALJ found the extent and severity of Plaintiff's allegations of disabling back and neck pain were not credible.[4]   (AR 23 ("The records as a whole are not consistent with the severity of symptoms and limitations alleged").)

The parties agree that Plaintiff has fibromyalgia and that it is a severe impairment.  (*See* AR 20.)   The ALJ specifically discounted Plaintiff's testimony as inconsistent with imaging reflecting "relatively minor degenerative changes without clinical correlation of pain or sensory or motor loss" and minimal objective findings.  (AR 23.)   While the inconsistency of objective medical evidence with subjective claims is generally considered a relevant factor in the ALJ's credibility analysis, *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999), fibromyalgia "eludes such measurement[,]" *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004).  *See also Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004) (fibromyalgia is "a medical label that . . . cannot be objectively proved"), *overruled on other grounds by Abatie v. Alta Health &*

_____

[4]   In her reply brief, Plaintiff argues that the Commissioner has already conceded that the objective medical evidence supports Plaintiff's testimony, because at Step 4 of the sequential analysis the ALJ "specifically found that: After careful consideration of the evidence, I find that [Plaintiff]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms; . . . AR 22.  In other words, the ALJ reviewed the objective evidence[ ] and agreed with [Plaintiff] that indeed her symptoms to which she testified to (*sic*) where (*sic*) reasonably caused by her medical impairments."  (Doc. 13, p. 4.)

There is a distinction between crediting a claimant's medical evidence at Step 2 of the sequential evaluation, which requires only a *de minimis* showing to establish the existence of a medically determinable impairment, and fully crediting the total severity and extent of her alleged symptoms at Step 4.  *See Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (Step 2 is "a de minimis screening device [used] to dispose of groundless claims" (quoting *Smolen*, 80 F.3d at 1290)); *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) ("an ALJ's decision is not necessarily internally inconsistent when an impairment found to be severe is ultimately found not disabling: the standard for a finding of severity under Step 2 of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases").

Here, the ALJ evaluated the medical evidence to determine whether Plaintiff had met her burden of presenting evidence establishing the existence of a severe impairment at Step 2.  The ALJ then evaluated the medical evidence in the context of Plaintiff's testimony at Step 4 – a different inquiry than that performed at Step 2.  The ALJ's determination that Plaintiff had severe medically determinable impairments at Step 2 is therefore *not* a determination or concession that Plaintiff's testimony as to the severity and extent of her symptoms is supported by the medical evidence.

1  *Life Ins.*, 458 3.d 955, 970 (9th Cir. 2006) (en banc).  "[F]ibromyalgia's cause or causes are

2  unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely

3  subjective. There are no laboratory tests for the presence or severity of fibromyalgia." *Id.*

4  Fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms."

5  *Benecke*, 379 F.3d at 590.  In such cases, the absence of abnormal test results or other discernible

6  symptoms do not undermine claims of pain caused by fibromyalgia.  *Id.*  (providing that "to date

7  there are no laboratory tests to confirm [fibromyalgia]").  Consequently, while the lack of

8  objective medical findings may be a valid reason to discount Plaintiff's subjective testimony as to

9  the symptoms of her degenerative disc disease, it cannot serve as a basis for discounting Plaintiff's

10  subjective symptom testimony as to her fibromyalgia.

11      Next, the ALJ discredited Plaintiff's symptom testimony based upon her history of alleged

12  conservative treatment, generally limited to medication, steroid injections, and physical therapy.[5]

13  (AR 23.)  The ALJ also emphasized that Plaintiff declined treatment and medication, including

14  referrals to pain management and fibromyalgia medication.   (AR 23.)   Where a plaintiff

15  "complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment,

16  for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or

17  exaggerated." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).  However, there is nothing in the

18  medical record to suggest that Plaintiff's doctors ever recommended injections or physical therapy

19  as treatment for Plaintiff's *fibromyalgia*.   Indeed, there is nothing in the record to show that

20  injections or physical therapy are medically available or acceptable treatments for fibromyalgia.

21  *See Jordan*, 370 F.3d at 872 ("There is no cure [for fibromyalgia]"); *Graf v. Astrue*, No. EDCV

22  10-1197-MLG, 2011 WL 891104 at *4 (C.D. Cal. Mar. 11, 2011).

23      Further, the ALJ's characterization of Plaintiff's refusal of a referral to pain management

24  and fibromyalgia medication ignores evidence in the record indicating that Plaintiff did see a pain

25  management specialist on at least one occasion and Plaintiff's use of and response to Cymbalta, a

26  prescription drug used to treat fibromyalgia.  (*See, e.g.,* AR 404-10.)  Plaintiff repeatedly sought a

27

28  [5]   The Court notes the ALJ indicated that Plaintiff declined a recommendation for physical therapy (AR 23), despite that the record contains physical therapy records from Kern Medical Center from spring of 2012 (AR 338-55).

1    definitive diagnosis or explanation for her disabling pain, refusing the "trashcan diagnosis for

2    when they can't find what's wrong with you" of fibromyalgia.   (AR 51-52.)   The record

3    demonstrates that while Plaintiff repeatedly refused the diagnosis of fibromyalgia and did indeed

4    decline fibromyalgia medication and pain management at certain points, it was because she sought

5    instead an objective diagnosis and source of her pain.   (*See* AR 337 (refusing a diagnosis of

6    fibromyalgia because her primary care physician "does not think fibromyalgia is a legitimate

7    diagnosis"); 389 (denying an offered diagnosis of fibromyalgia because "something is wrong

8    [with] [her] back"); 393 ("crying" and "demanding to be told what's wrong with her"); 404

9    (expressing frustration that no diagnosis had been made).

10          The ALJ also discounted Plaintiff's credibility as to her allegations of "disabling back and

11   neck pain" on the basis of her inconsistent complaints of back pain.   (AR 23.)   It is unclear

12   whether or not the ALJ also intended to discount Plaintiff's complaints of full-body pain regarding

13   her medically determinable fibromyalgia impairment.   Even assuming the ALJ discounted

14   Plaintiff's credibility as to the limitations imposed by her fibromyalgia symptoms on the basis of

15   inconsistent complaints, the record is replete with Plaintiff's complaints of full-body pain.   (*See,

16   e.g.,* AR 265-69 (reporting pain); 272-78 (complaining that "ever[y] joint in her body h[u]rts");

17   282; 314 (complaining that she "can't walk at all" due to full-body pain); 315 (complaining of

18   diffuse full-body pain); 323 (complaining of "constant" neck and back pain); 329 (complaining of

19   "longstanding" pain and numbness in her neck, shoulder, and arm); 341-352 (reporting recurring

20   pain at physical therapy); 404 (pain on spinal palpation); 410 (complaining of severe pain and

21   stiffness); *see also* AR 203 (stating that she cannot be on her feet for more than an hour "without

22   pain so bad I fear I will pass out" and that even sitting "for very long is agony").)   *See* Social

23   Security Regulation ("SSR") 96-7P, 1996 WL 374186 at *7 ("In general, a longitudinal medical

24   record demonstrating an individual's attempts to seek medical treatment for pain or other

25   symptoms and to follow that treatment once it is prescribed lends support to an individual's

26   allegations of intense or persistent pain or other symptoms for the purposes of judging the

27   credibility of the individual's statements").   Plaintiff has taken both Norco and Vicodin for her

28   pain complaints since at least 2008. (*See, e.g.,* AR 265; 268; 324; 410; *see also* 224-25 (stating

1  that "[t]he only way I can get anything done is by taking Vicodin first").)  Insofar as the ALJ may

2  have intended to discount Plaintiff's pain testimony as to her medically determinable fibromyalgia

3  impairment, the ALJ's rejection of Plaintiff's subjective complaints of disabling pain as

4  inconsistent with the record is unsupported by a review of the administrative record.

5        After considering Plaintiff's neck and back pain specifically, the ALJ analyzed Plaintiff's

6  lay testimony under the factors articulated SSR 96-7p[6], which includes a claimant's activities of

7  daily living.  The ALJ concluded as follows:

8      I have analyzed the credibility of the claimant's allegations pursuant to SSR 96-

       7P, and found they are not fully credible.  Despite his alleged impairments, the

9      claimant has engaged in a somewhat normal level of daily activity and interaction

       as noted above, and some of the physical and mental abilities and social

10     interactions required in order to perform these activities are the same as those

       necessary for obtaining and maintaining employment.  The claimant's ability to

11     participate in such activities undermines the credibility of his allegations of

12     disabling functional limitations.

13 (AR 24.)

14       The ALJ's credibility analysis, having considered Plaintiff's neck and back pain testimony,

15 is so devoid of any actual factual content contained in the record it is rendered entirely generic.

16 *See* SSR 96-7p.  The credibility analysis is so non-specific it could be inserted into *any* decision

17 where the ALJ based an adverse credibility finding on daily activities – it fails to specifically refer

18 to Plaintiff's testimony and even refers to Plaintiff as a "he."  It is simply a conclusory statement

19 that the claimant's daily activities, as recited earlier, are not consistent with the claimant's subject

20 lay testimony.  This type of reasoning is not conducive to judicial review, as discussed in *Burrell*

21 *v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).  In *Burrell*, the ALJ discredited the plaintiff's lay

22 statements as inconsistent with her daily activities but "did not elaborate on *which* daily activities

23 conflicted with *which* part of [the plaintiff]'s testimony."  775 F.3d at 1138.  Because there were

24 no obvious inconsistencies between the plaintiff's activities and subjective complaints of pain, the

25 Court refused to "take a general finding – an unspecified conflict between [the plaintiff]'s

26 _____

27 [6]    Social Security Rulings ("SSR") are final opinions and statements of policy by the Commissioner of Social Security, binding on all components of the Social Security Administration.  20 C.F.R. § 422.406(b)(1).  They are "to be relied upon as precedent in determining cases where the facts are basically the same."  *Paulson v. Bowen*, 836 F.2d

28 1249, 1252 n.2 (9th Cir.1988).

1  testimony about daily activities and her reports to doctors – and comb the administrative record to
2  find specific conflicts" to support the ALJ's conclusion." *Id.*  The Ninth Circuit remanded the
3  case, in part, based on the ALJ's failure to meet the Court's "'requirements of specificity'" in
4  discounting the plaintiff's credibility. *Id.* at 1138 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873
5  (9th Cir. 2003).)

6      Similarly, while the ALJ in this case summarized Plaintiff's activities, it is not clear *which*
7  specific activities are actually in conflict with her full-body pain testimony.   For example,
8  although Plaintiff was able to do some part-time work, she had stopped doing that because of pain
9  and is now limited to walking her dog a small distance and doing certain household chores with
10  difficulty.   "The importance of the credibility of subjective complaint is underscored where, as
11  here, the underlying condition is one that defies objective clinical findings." *Calkosz v. Colvin*,
12  No. C-13-1624-EMC, 2014 WL 851911 at *5 (N.D. Cal. Feb. 28, 2014) (citing *Jordan*, 370 F.2d
13  at 872).   The ALJ discredited Plaintiff's subjective complaints by pointing to her ability to engage
14  in some degree of daily activity.   (AR 21-22.)   It is well established, however, that "the mere fact
15  that a plaintiff has carried on certain daily activities does not in any way detract from her
16  credibility as to her overall disability.   One does not need to be 'utterly incapacitated' in order to
17  be disabled." *Benecke*, 379 F.3d at 594 (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir.
18  2001)); *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

19      The ALJ erred in relying on Plaintiff's daily activities to discredit her pain testimony
20  (AR 24), despite that her daily activities "are quite limited and carried out with difficulty," *see*
21  *Benecke*, 379 F.3d at 594.   The record demonstrates Plaintiff "briefly" worked three hours three
22  days a week as an in-home caretaker, and once she was unable to continue that work, she worked
23  "a few hours" twice a week, every other week as a greeting card stocker at a store until she was no
24  longer able to continue that work.   (AR 21; 225.)   Plaintiff takes care of her pet Chihuahua, walks
25  a small distance to open up a gate each morning, sweeps, wipes counters and mirrors, does her
26  own laundry, is able to clean her bathtub and toilet with difficulty, occasionally plays short
27  computer games, is able to drive short distances, and is able to prepare "easy dinners" on her stove
28  and make sandwiches.   (AR 21-22; *see* AR 225-28.)   Plaintiff also goes out and walks house-to-

house for one hour, in fifteen minute increments, twice a week as a Jehovah's Witness.  (AR 22; *see* AR 41-42.)  The ALJ's finding, however, ignored Plaintiff's testimony that despite desiring to work, she is unable to maintain even part-time work (AR 35-36 (she "couldn't stand up anymore"); 38-39 (despite desiring to continue working, she "just couldn't physically do them anymore"); 53-54 (testifying that she "cannot express" the pain that she endured just trying to work part-time)); 55 (she was unable to work for even a few hours without Vicodin), that she can only tolerably stand unassisted for up to five minutes without "agony" (AR 39-40), or that in order to be functional for two hours, she must rest five or six hours (AR 55).

Thus, even if the Court assumes which specific daily activities the ALJ considered to be inconsistent with Plaintiff's lay testimony, the activities do not clearly and convincingly provide support for the ALJ's adverse credibility determination.  The ALJ's generic credibility analysis with regard to Plaintiff's fibromyalgia pain "all over her body" cannot be bolstered by the Court or the Commissioner's post-hoc findings, even if such an analysis is sound and can be supported by facts in the record.  *Burrell*, 775 F.3d at 1138 ("Our decisions make clear that we may not take a general finding – an unspecified conflict between Claimant's testimony about daily activities and her reports to doctors – and comb the administrative record to find specific conflicts."); *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) ("the inconsistencies identified independently by the district court cannot provide the basis upon which we can affirm the ALJ's decision").  The Court cannot conclude that Plaintiff's limited daily activities and "brief" periods of part-time work are substantial evidence of Plaintiff's ability to sustain full-time work despite the limitations imposed by her medically determinable fibromyalgia impairment.

Finally, though the parties did not brief the issue, the undersigned notes that the ALJ put particular emphasis on Plaintiff's testimony that "her doctor would not put her on disability because she did not want to lose her license."  (AR 22.)  During the hearing, the ALJ spent a considerable amount of time questioning Plaintiff about a physician's note reflecting that she had requested to be put on state disability and had become upset when her physician would not put her on state disability.  (AR 49-50; *see* AR 406.)  Later in the hearing, however, Plaintiff explained that her physician would not put her on disability because too long a period of time had elapsed

1    since her last day of work for her to qualify for state disability benefits, *not* because her physician

2    thought she was not disabled or in disabling pain.  (AR 50 (Dr. Bravo "never thought [Plaintiff]

3    wasn't in pain"); 57-58 (because she had to wait for the paperwork and then an appointment with

4    Dr. Bravo to fill out an application for state disability, by the time she met with Dr. Bravo the

5    deadline to apply for benefits had already passed).  To the extent the ALJ based any part of his

6    credibility finding on this part of Plaintiff's testimony, it is not supported by substantial evidence

7    in the record.

8          In sum, the ALJ erred in discounting Plaintiff's credibility, and remand for reconsideration

9    is warranted.

10         **3.      The ALJ's Failure to Consider Plaintiff's Mother's Testimony**

11         Plaintiff's mother, Naomi Lopez, completed a third-party function report about how

12   Plaintiff's illnesses, injuries, or conditions limit her activities.  (AR 233-240.)   Ms. Lopez's

13   assessment is substantially similar to Plaintiff's self-assessment.  (*Compare* AR 225-32 *with* 233-

14   40.)  The ALJ did not address Ms. Lopez's third-party assessment in his decision.  (*See* AR 18-

15   26.)  Because the ALJ failed to give valid reasons for rejecting Plaintiff's testimony, *see supra*, his

16   silent rejection of Ms. Lopez's testimony is not harmless.  *Molina v. Astrue*, 674 F.3d 1104, 1115-

17   17 (9th Cir. 2012) (noting that "[w]here lay witness testimony does not describe any limitations

18   not already described by the claimant, and the ALJ's well-supported reasons for rejecting the

19   claimant's testimony apply equally well to the lay witness testimony, . . . the ALJ's failure to

20   discuss the lay witness testimony [is not] prejudicial per se").  On remand, therefore, unless the

21   ALJ is able to properly discredit Plaintiff's testimony, the ALJ must offer germane reasons for

22   rejecting Ms. Lopez's testimony.  *See id.*, at 1114; *Lewis v. Apfel*, 236 F.3d 503, 511-12 (9th Cir.

23   2001).

24                                  **CONCLUSION**

25         Based on the foregoing, the Court finds that remand is necessary to reconsider Plaintiff's

26   credibility and to consider Plaintiff's mother's testimony.   Accordingly, the Court GRANTS

27   Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The

28   //

24

1   Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Debra Rosalyn Knowles,

2   and against Carolyn W. Colvin, Acting Commissioner of Social Security.

3

4   IT IS SO ORDERED.

5   Dated:   **January 27, 2016**                                        **/s/ Sheila K. Oberto**
                                                                    UNITED STATES MAGISTRATE JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28